UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**JOHN ZIPPO**,

                 Plaintiff,

  -against-

**CITY OF NEW YORK; CAPTAIN SMART; CAPTAIN DAVIS; CAPTAIN JEFFRIES; CAPTAIN MATHEUS; CO WASHINGTON; CO VALDEZ; CO LEE; CO TITTLE; CO VASQUEZ; JOHN DOES 1–6**,

                 Defendants.

**COMPLAINT**

Case No. 1:23-cv-00865

---

Plaintiff John Zippo ("Plaintiff"), by his attorneys at Rickner PLLC, complaining of the Defendants, alleges, upon information, belief, personal knowledge:

**NATURE OF THE CASE**

1. This is a civil rights action brought against the City of New York and members of the New York City Department of Correction ("DOC"), who violated Plaintiff's rights under the Constitution of the United States and the Constitution of the State of New York, and committed torts actionable under the common laws and statutes of the State and City of New York.

**JURISDICTION**

2. Jurisdiction is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1331, because Plaintiff's claims are brought under 42 U.S.C. § 1983.

3. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

4. Pursuant to New York State General Municipal Law § 50-e, Plaintiff filed a timely Notices of Claim with the New York City Comptroller, who designated the claims as

1

202200098622.

5. Plaintiff appeared for a hearing under New York State General Municipal Law § 50-h on August 24, 2022.

6. Plaintiff's claims were not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

## VENUE

7. Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391(b)(2), because Plaintiff's claims arose within the jurisdictional boundaries of Southern District of New York.

## PARTIES

8. Plaintiff John Zippo ("Plaintiff") is a resident of Queens County in the State of New York. At all times relevant herein, he was detained on Rikers Island in the City of New York.

9. Defendant the City of New York is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a corrections department that acts as its agent in the area of law enforcement, for which it is ultimately responsible.

10. Defendant the City of New York assumes the risks incidental to the maintenance of a corrections department and the employment of corrections officers, as said risks attach to the public consumers of the services provided by the Department of Correction ("DOC").

11. Defendant Captain Smart (first name unknown) (hereinafter "Shaw"), was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

12. Captain Smart is entitled to indemnification by the City of New York under New York

law for any liability arising from his conduct described herein.

13.   Captain Smart is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

14.   Defendant Captain Davis (first name unknown) (hereinafter "Davis"), was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

15.   Captain Davis is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

16.   Captain Davis is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

17.   Defendant Captain Jeffries (first name unknown) (hereinafter "Jeffries"), was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

18.   Captain Jeffries is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

19.   Captain Jeffries is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

20.   Defendant Captain Matheus (first name unknown) (hereinafter "Jeffries"), was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

3

21.  Captain Matheus is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

22.  Captain Matheus is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

23.  Defendant Corrections Officer Washington (first name unknown) (hereinafter "Washington") was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

24.  CO Washington is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

25.  CO Washington is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

26.  Defendant Corrections Officer Valdez (first name unknown) (hereinafter "Valdez") was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

27.  CO Valdez is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

28.  CO Valdez is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

29.  Defendant Corrections Officer Lee (first name unknown) (hereinafter "Lee") was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York.

At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

30. CO Lee is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

31. CO Lee is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

32. Defendant Corrections Officer Tittle (first name unknown) (hereinafter "Tittle") was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

33. CO Tittle is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

34. CO Tittle is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

35. Defendant Corrections Officer Vasquez (first name unknown) (hereinafter "Vasquez") was, at all relevant times described herein, a DOC corrections officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York State law, and acting in the course and scope of his duties. He is sued in his individual capacity.

36. CO Vaquez is entitled to indemnification by the City of New York under New York law for any liability arising from his conduct described herein.

37. CO Vaquez is entitled to indemnification by the City of New York pursuant to contract for any liability arising from his conduct described herein.

38. Defendant John Does 1–3 ("Does 1–3") were, at all relevant times described herein, DOC corrections officers, employed by the City of New York. At the time of the incidents described Does 1–3 were stationed in intake area in the Anna M. Kross Center ("AMKC") on Rikers Island. At all relevant times, Does 1–3 were acting under color of New York State law, and acting in the course and scope of their duties attendant to that employment. Each is sued in an individual capacity.

39. Defendant John Doe 4 ("Doe 4") was, at all relevant times, a DOC corrections officer employed by the City of New York. At the time of the incidents described herein, Doe 4 was stationed in the Eric M. Taylor Center ("EMTC") on Rikers Island, C 76, 6 lower, and is described as Jamaican or West Indian, around 6'1 or 6'2". At all relevant times, Doe 6 was acting under color of New York State law, and acting in the course and scope of his duties attendant to that employment. He is sued in an individual capacity.

40. Defendant John Does 5–6 (the "Does 5–6") were, at all relevant times, parole officers employed by the State of New York. At all relevant times described herein, Does 4–5 were acting under color of New York State law, and acting in the course and scope of their duties attendant to that employment. Each is sued in an individual capacity.

41. The true identities of the Doe Defendants are not currently known to Plaintiff. However, Does 1–4 are agents and employees of the City of New York. Accordingly, each is entitled to representation in this action by the New York City Law Department, pursuant to New York State General Municipal Law§ 50-k. The Law Department, then, is hereby put on notice (a) that Plaintiff intends to name said officers as defendants in an amended complaint; and (b) that the Law Department should immediately begin preparing the Doe Defendant's defenses in this action.

42. Defendants Smart, Davis, Jeffries, Matheus, Washington, Valdez, Lee, Tittle, Vasquez, Does 1–4 are referred to collectively as the "City Defendants."

43. Does 5 and 6 are referred to collectively as the "State Defendants."

44. At all times relevant herein, the City Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees, and officers of the DOC, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the DOC at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the DOC and incidental to the pursuit of their duties as employees of the City.

45. At all times relevant herein, the State Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees, and officers of the New York State Department of Correction and Community Supervision ("DOCCS"), and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of DOCCS at all times relevant herein, with the power and authority vested in them as officers, agents and employees of DOCCS and incidental to the pursuit of their duties as employees of the State.

## THE VIOLATION OF PLAINTIFF'S CIVIL RIGHTS

### The January 2022 Incidents

46. In January 2022, Plaintiff was detained in unit C76 of the Eric M. Taylor Center ("EMTC") on Rikers Island, where he obtained a job as a porter in sanitation.

47. Defendant CO Washington was Plaintiff's supervisor. Washington forced Plaintiff to work approximately 17 hours a day in shoes that were too small. This caused Plaintiff's feet to swell, blister, and become increasingly sore as the workdays went on.

48. On or about January 17, 2022, Washington came into Plaintiff's dorm and made a loud comment to a detained individual about borrowing the man's cell phone when he was finished with it. Washington intentionally made the comment in front of the detained population, as if to give some type of warning prior to seizure of the cell phone, and then left the dorm.

49. The individual to whom the cell phone comment was made (who, upon information and belief, is a member of a gang that had taken over the dorm) immediately approached Plaintiff and another porter and accused them of snitching to Washington. But Neither Plaintiff nor the other porter knew anything about the cell phone, and they told the men the same.

50. Several of the gang members pulled out razor blades and threatened to attack Plaintiff and the other porter if the dorm was subjected to a contraband search.

51. That night, around midnight on January 18, 2022, Plaintiff went to work and reported the threats to Washington, who took no steps to protect Plaintiff or the other porter.

52. Later in the day on January 18th, a search team came to the dorm and recovered a cell phone in one of the gang members' belongings.

53. Knowing that they were under threat of violence, Plaintiff and the other porter asked CO Valdez to be removed from the area for their protection, explaining the threats they received the day before. But Valdez only removed the other man from the dorm, and left Plaintiff there with the gang members who had threatened him the day before.

54. Predictably, the gang members followed through on their threats just minutes after the officers completed the search and left the dorm. One gang member approached Plaintiff and stated "you need to leave" as two additional men approached and surrounded Plaintiff.

55. Plaintiff told the men he didn't have anything to do with reporting the cell phone. In response, a fourth gang member approached Plaintiff and punched him directly in the jaw on the

right side of his face, causing Plaintiff to fall to the ground.

56.   Plaintiff was then dragged to a shower area, out of the view of surveillance cameras, and severely beaten by approximately seven of the gang members.

57.   The officer who found Plaintiff eventually moved him to a new housing area in the same dorm, and was told he would be moved to a new building shortly thereafter.

58.   While Plaintiff was taken for x-rays on the island, he was told that he was fine. This was a lie—Plaintiff had broken bones in his face, which were not properly diagnosed until he took himself to a hospital after his release from detention, on or about January 27, 2022.

59.   On January 20th, Washington approached Plaintiff's cell and told him he was fired from his porter job. When Plaintiff asked why, Washington did not respond.

60.   Later that day, Plaintiff was placed onto a bus for transfer from EMTC to AMKC.

61.   Upon boarding, Plaintiff immediately recognized the other detained men on the bus as the same persons who brutally attacked him in EMTC.

62.   Plaintiff informed Lee and Tittle, the transport officers, about his safety concerns. Neither officer removed Plaintiff or the gang members from the transport bus.

63.   Plaintiff was placed into a single-person cage by Lee for the short trip to AMKC. But Lee failed to secure the lock on the cage, leaving Plaintiff vulnerable to attack.

64.   While the men were supposed to disembark at C-95 of AMKC, they were told to remain on the bus, because AMKC was experiencing flooding, overcrowding, and an epidemic of slashings that slowed the intake process for new admissions or transfers.

65.   Plaintiff and the other detained men were forced to remain on the bus for several hours, during which time the gang members became angry and disruptive out of frustration over the delay. Eventually, they broke a window and a latch holding them in, and took over the bus.

66.  Without the officers on board, the gang members easily opened the unlocked gate of Plaintiff's cage, pulled him out, and began beating and kicking Plaintiff while he was cuffed.

67.  Officer Lee was on the bus when the takeover began, and was threatened by the gang members near the front of the bus.

68.  Tittle exited the bus, and neither Tittle nor Lee did anything to protect Plaintiff or the other individuals who were uninvolved in the gang's disruptions and violence.

69.  Eventually, the gang members disembarked and congregated in the yard outside. Lee then reentered the bus, where Plaintiff was the only detained person still on board.

70.  Plaintiff reiterated that he never should have been near these gang members, who had attacked him twice in two days, warning Lee that he was vulnerable to further attack.

71.  Lee told Plaintiff he would keep him safe, closed the cage door, but *again* failed to secure the lock. Around the same time, the men outside were complaining that they were cold and insisted that they be let back onto the bus.

72.  Plaintiff begged Lee not to open the bus door and let the gang members on board. But Lee opened it anyway, and the men quickly rushed Lee and took over the bus a second time.

73.  Tittle came on to the bus during his second takeover, but immediately left when the gang members told her to. She took no steps to protect Plaintiff or call for assistance.

74.  Unsurprisingly, Plaintiff was attacked a third time by a gang member who called Plaintiff a "rat" during the assault.

75.  Neither Lee nor Tittle called for backup during this multi-hour ordeal. Nevertheless, the Emergency Services Unit ("ESU") eventually came and sprayed everyone with mace, including Plaintiff, and told them they would be taken inside of AMKC.[1]

---

[1] Upon information and belief, a Captain told Lee that he was going to be suspended for at least 30 days.

76. The inside of AMKC was a disaster. Intake was flooded with raw sewage, and Plaintiff ordered into a holding cell *with the same gang members*.

77. Plaintiff told the intake Captain that he was attacked, needed medical attention, and could not be in the same area as these particular men.

78. Plaintiff explained that he was supposed to be moved to AMKC to be separated from this threat, but instead, the threat was following him to the new unit.

79. Plaintiff was placed into an individual mental health, away from his attackers, where he remained for approximately two more hours before Does 1–3 came to move him.

80. But when Plaintiff saw he was being placed in a line with the gang members, he refused to go with them, reporting to Does 1–3 that he could not be near these men who had already attacked him three times.

81. In retaliation for this refusal, the Does 1–3 forced Plaintiff to remain in the sewage-ridden cell all night. Plaintiff's swollen feet, which had open sores from working 17 hours a day with shoes that were too small, became infected after being exposed to the sewage.

82. The next day on January 21, 2022, Plaintiff reported the assaults to a deputy, who finally moved Plaintiff to a new location, away from his assailants.

83. During the course of these events between January 17 and 21, 2022, Plaintiff personally warned Smart, Davis, Jeffries, Matheus, Washington, Valdez, Lee, and Tittle that he was in danger and needed protective custody. Not one of these Defendants acted to protect Plaintiff from this known danger, even as the assaults continued over the course of two days.

84. After these attacks, Plaintiff requested medical care every day until his release from custody, insisting that he was injured so severely that he needed outside care. Theses requests were summarily denied.

85. It was only after Plaintiff was released from that he was able to get the medical attention he needed. On or about January 27, 2022, Plaintiff was diagnosed with an orbital fracture and a mandible fracture at an outside hospital.

86. On or about January 31, 2022, Plaintiff went to a second hospital for repeat imaging, confirming the fractures to his face.

87. On or about February 22, 2022, Plaintiff returned to the hospital for repeat imagining and was diagnosed with post-concussive syndrome.

88. Plaintiff also sustained a jammed finger and an infection on his feet and toes from the filth in AMKC's intake area.

### The December 2022 Incidents

89. Plaintiff remained out of custody for nearly a year, during which time he sought extensive care for his injuries.

90. On or about December 17, 2022, Plaintiff appeared for a preliminary parole revocation hearing in a Queens Court, and was ordered released from custody pending a final hearing.

91. The parole officers tasked with escorting Plaintiff from the courtroom, Does 5–6, were angry that Plaintiff was released, and made comments to Plaintiff about the "lenient" laws that allowed Plaintiff to be released.

92. Plaintiff responded, telling Does 5–6 that they should not be in law enforcement if they did not believe in enforcing the law, including the judge's order to release him.

93. But Does 5–6 wanted to punish Plaintiff anyway, ignored the judge's order, and agreed to put Plaintiff on a transport bus to Rikers, rather than letting him go.

94. While Plaintiff was on the bus to Rikers, his loved ones and lawyers were waiting for him outside the courthouse, concerned about his sudden disappearance.

95. Plaintiff was subsequently placed in the same dorm where he was assaulted 11 months

before: EMTC C76, 6 lower.

96. The placement immediately triggered Plaintiff's PTSD, and he approached CO Vasquez and Doe 4, explaining his prior experience in the dorm and his fear of further attack.

97. Plaintiff was approached by gang members and threatened almost immediately. He repeatedly approached Vasquez and Doe 4 about these threats.

98. Plaintiff also told Vasquez and Doe 4 that he was being unlawfully detained. Neither officer took steps to protect Plaintiff, or effectuate his release from custody.

99. Once again, Plaintiff was attacked by approximately 10 gang members, this time directly in front of the "bubble" where Vasquez was stationed.

100. Neither Vasquez nor Doe 4 timely intervened to prevent the assault, and Plaintiff was left with a broken hand, worsened brain injury, and boot prints and bruises all over his body from being stomped and kicked by the assailants.

101. Plaintiff did not receive medical care on Rikers. Instead, he was taken to the bull pens and left there for a few hours before being released from custody.

102. Plaintiff never should have been on Rikers Island following the Court's order of release at the parole hearing. Thus, all injuries flowing from this unlawful detention are attributable to the parole officers, Does 5 and 6, who knowingly detained Plaintiff in violation of his rights.

## THE INJURIES TO PLAINTIFF

103. This action seeks damages on behalf of Plaintiff for the extraordinary emotional pain and suffering and injuries to his person, that Plaintiff was forced to endure as a consequence of the Defendants' decidedly wrongful actions.

104. The City and State Defendants' actions were wanton, reckless, and malicious, as well as in blatant disregard of Plaintiff's civil rights, and as such these Defendants are liable for punitive

13

damages, as is the City of New York for the acts of the City Defendants under the doctrine of *respondeat superior*.

105. All of the causes of action pleaded herein fall within one or more of the exceptions set forth in New York's Civil Practice Law & Rules 1602 with respect to joint and several liability.

**FIRST CLAIM FOR RELIEF:**
**DELIBERATE INDIFFERENCE UNDER 42 U.S.C. § 1983**
**AGAINST THE CITY AND STATE DEFENDANTS**

106. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

107. Plaintiff, a parolee who was held at Rikers post-conviction, is protected from cruel and unusual treatment under the Eighth Amendment. This includes the right to be protected from dangers of which the Individual Defendants were personally aware, but did not address.

108. Defendant Washington acted with deliberate indifference when he forced Plaintiff to work for 17 hours a day with shoes that were too small, which caused injury to Plaintiff's feet.

109. Defendants Smart, Davis, Jeffries, Matheus, Washington, Valdez, Lee, Tittle, Vasquez, and Doe 4 acted with deliberate indifference by failing to meaningfully respond to Plaintiff's repeated requests for protection.

110. Plaintiff warned these officers he was in danger both before and after each assault, but not one of them took any action whatsoever to protect Plaintiff from this known danger.

111. Does 1–3 also acted with deliberate indifference when they left Plaintiff in a cell overnight that was flooded with sewage. Does 1–3 knew that this presented a substantial risk of harm to Plaintiff, but they intentionally left him there anyway.

112. Does 5–6 acted with deliberate indifference when they knowingly sent Plaintiff to Rikers Island after a judge ordered his release from custody.

113. By virtue of the aforementioned acts, Plaintiff was deprived civil rights guaranteed under the Eighth and Fourteenth Amendments to the United States Constitution, and was caused to suffer physical, economic, and emotional injuries, as well as a depravation of liberty.

114. The City and State Defendants are therefore liable to Plaintiff for both compensatory and punitive damages under to 42 U.S.C. § 1983.

### SECOND CLAIM FOR RELIEF:
### STATE LAW NEGLIGENCE AGAINST THE CITY OF NEW YORK, SMART, DAVIS, JEFFRIES, MATHEUS, WASHINGTON, VALDEZ, LEE, TITTLE, AND DOES 1-3

115. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

116. Defendants City of New York, Smart, Favis, Jeffries, Matheus, Washington, Lee, Tittle, and Does 1–3 owed a duty of care to Plaintiff during his time in custody on Rikers.

117. This duty was breached by these Defendants with respect to the physical conditions on Plaintiff's confinement, as well as the failure to protect Plaintiff from physical violence.

118. As a result of this tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, for which Plaintiff is entitled to compensatory and punitive damages.

119. The City of New York is liable for the conduct of these City Defendants and any damages they caused under the doctrine of *respondeat superior*.

### THIRD CLAIM FOR RELIEF:
### INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST WASHINGTON AND DOES 1-3

120. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

121. Defendant Washington engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff, when he forced

15

Case 1:23-cv-00865-VSB-RWL    Document 1    Filed 02/01/23    Page 16 of 18

Plaintiff to work 17 hours a day, on his feet, in shoes that were too small.

122. Defendant Does 1–3 engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff, when they purposefully left Plaintiff in a cell flooded with human waste overnight.

123. As a result of this tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, for which Plaintiff is entitled to compensatory and punitive damages.

124. The City of New York is liable for the conduct of these City Defendants and any damages they caused under the doctrine of *respondeat superior*.

## FOURTH CLAIM FOR RELIEF:
### N.Y.C. ADMIN. CODE §§ 8-801–807 AGAINST THE CITY OF NEW YORK, SMART, DAVIS, JEFFRIES, MATHEUS, WASHINGTON, VALDEZ, LEE, TITTLE, DOES 1-3

125. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

126. Plaintiff's right to be free from unreasonable searches and seizures was violated by the conduct of the above-named Defendants in that his seizure on Rikers was unreasonable.

127. The City of New York is liable as the employer of these City Defendants under New York City Administrative Code § 8-803(b).

128. Qualified immunity is no defense to this claim.

129. As a result of this tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, for which Plaintiff is entitled to compensatory and punitive damages.

## FIFTH CLAIM FOR RELIEF:
### NEGLIGENT HIRING, TRAINING, SUPERVISION, DISICPLINE AND RETENTION AGAINST THE CITY OF NEW YORK

130. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

16

131. The City of New York negligently hired, trained, supervised, disciplined, and retained Defendants Smart, Davis, Jeffries, Matheus, Washington, Valdez, Lee, Tittle, and Does 1–3.

132. The acts and conduct of these Defendants were the direct and proximate cause of injury and damage to Plaintiff's rights under the Constitution of the United States and the Constitution of the State of New York, as well as violations of Plaintiff's right under the laws of the State and City of New York.

133. As a result of this tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, for which Plaintiff is entitled to compensatory and punitive damages.

## SIXTH  CLAIM FOR RELIEF:
### VIOLATION OF ARTICLE I, § 12 OF THE NEW YORK STATE CONSTITUTION AGAINST THE CITY OF NEW YORK, SMART, DAVIS, JEFFRIES, MATHEUS, WASHINGTON, VALDEZ, LEE, TITTLE, AND DOES 1-3

134. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

135. The conduct described herein breached the protections guaranteed to Plaintiff by the New York State Constitution, including, but not limited to, rights secured under Article 1, § 12.

136. As a direct and proximate result of these Defendants' acts and omissions, Plaintiff was deprived of the rights, privileges, and immunities guaranteed by the New York State Constitution.

137. As a result of this unconstitutional conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, for which he is entitled to compensatory and punitive damages.

138. The City of New York is liable for the conduct of these City Defendants and any damages they caused under the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of the Individual Defendants, as well as the City of New York:

    a.   Compensatory damages;

    b.   Punitive damages;

    c.   The convening and empaneling of a jury to consider the merits of the claims herein;

    d.   Costs and interest and attorney's fees;

    e.   Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
       February 1, 2023

Rickner PLLC

By: _____

    Stephanie Panousieris

    14 Wall Street, Suite 1603
    New York, New York 10005
    Phone: (212) 300-6506
    Fax: (888) 390-5401
    *Attorney for Plaintiff*